UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

| | |
|---|---|
| UNILOC 2017 LLC,<br><br>          Plaintiff,<br><br>     v.<br><br>HTC AMERICA, INC.,<br><br>          Defendant. | CASE NO. C18-1732 RSM<br><br>ORDER RE CLAIM CONSTRUCTION |

## I.     INTRODUCTION

This matter is before the Court for construction of certain terms used in the Claims of Patent No. 6,836,654 ("the '654 Patent").  The '654 Patent relates to mobile radiotelephony devices (cell phones) and the manner in which cell phones, by locking at different states of operability (blocking states), are secured against unauthorized use to discourage theft.  The parties have presented the Court with the terms that they recommend the Court interpret and have briefed their favored constructions of those terms.  Dkts. #42 and ##46–51.  The parties were also afforded an opportunity to argue and answer questions at a *Markman* hearing.  Now, having fully considered the issue, the Court decides as follows.

## II.     BACKGROUND

The '654 Patent was filed in 2000, at a time when cell phones generally had to be deactivated at the network level if they were lost or stolen.  This allowed charges to be incurred

ORDER – 1

on a user's account between the time the loss or theft occurred and the time the network operator was able to deactivate the cell phone. The '654 Patent, issued in 2004, addressed deactivation at the phone level by the use of three "blocking states." A first blocking state required a linked user identification module (e.g. a SIM card) without which the phone would not operate on the network.[1] If the linked user identification module was present, the phone would work in its normal operative state—allowing for both inbound and outbound calls. A device entered the second blocking state after a period of inactivity. In the second blocking state, the phone could receive calls, but could not make outgoing calls (possibly excepting calls to emergency numbers). After entering the second blocking state, the device required a passcode (e.g. PIN) to be entered to return to the normal operative state. If the correct passcode was not provided within a specified number of attempts, the phone would move to the third blocking state. In this third blocking state, the phone would lock such that it was inoperative (again possibly excepting calls to emergency numbers) until an unblocking code linked to the user identification module was provided at the network level.

      Uniloc initiated this action on the basis that HTC had infringed upon claims 1, 3–5, and 7 of the '654 Patent. Dkt. #1 at ¶¶ 12, 15–18. Pursuant to this Court's local patent rules, the parties submitted a Joint Claim Construction and Prehearing Statement setting forth the claim terms and phrases in need of construction. Dkt. #42. The Court's local patent rules limit construction to "a maximum of ten claim terms at the initial *Markman* hearing, unless the Court determines otherwise." LPR 132(c). Nevertheless, the parties set forth a list of seventeen terms and phrases needing construction. Dkt. #42 at 5–20. The parties agree that the first ten claim

---

[1] Patent No. 5,913,175 ("the '175 Patent") constituted prior art and provided for linking a device to a specific user identification module such that a stolen device could not be used with a different user identification module. But deactivation still had to occur at the network level if the device was stolen with the linked user identification module.

ORDER – 2

terms are the most important. *Id.* at 2.  But HTC further requests that the Court construe at least the first thirteen, and preferably all seventeen, terms and phrases. *Id.* at 3.  Uniloc maintains that construction of the first ten terms and phrases is sufficient. *Id.*

Importantly, this Court's construction of the '654 Patent does not proceed in isolation as litigation related to the '654 is proceeding in several other United States District Courts.  Uniloc is concurrently pursuing actions against Motorola,[2] Google,[3] Samsung,[4] Microsoft,[5] and Apple.[6]  The *Motorola*, *Google*, and *Samsung* courts have all issued orders on claim construction related to the '654 Patent.  *See* Dkt. #42 at 21–33 (*Motorola*), 34–112 (*Google*), 113–165 (*Samsung*).  Uniloc indicates that "[o]ther than one term, the constructions . . . were effectively the same" in the *Motorola* and *Google/Samsung* actions.  Dkt. #46 at 8.  The Court remains mindful of these prior orders as it proceeds to claim construction.

### III.   DISCUSSION

**A. Legal Standard**

The scope of a patent is measured by its claims. *Phillips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005) (citing *Innova/Pure Water, Inc. v. Safari Water Filtration Systems, Inc.*, 381 F.3d 1111, 1115 (Fed. Cir. 2004); *Vitronics Corp. v. Conceptronic, Inc.*, 90 F.3d 1576, 1582 (Fed. Cir. 1996) ("we look to the words of the claims themselves . . . to define the scope of the patented invention"); *Markman v. Westview Instruments, Inc.*, 52 F.3d 967, 980 (Fed. Cir. 1995)

---

[2] *Uniloc 2017 LLC v. Motorola Mobility, LLC*, Case No. 1-18-cv-01844 (D. Del.).

[3] *Uniloc 2017 LLC v. Google LLC*, Case No. 2-18-cv-00493 (E.D. Tex.).

[4] *Uniloc 2017 LLC v. Samsung Electronics America, Inc.*, Case No. 2-18-cv-00508 (E.D. Tex.).

[5] *Uniloc 2017 LLC v. Microsoft Corporation*, Case No. 8-19-cv-00781 (C.D. Cal.).

[6] *Uniloc 2017 LLC v. Apple Inc.*, Case No. 3-19-cv-01697 (N.D. Cal.).

ORDER – 3

(en banc), *affirmed*, 517 U.S. 370 (1996) ("The written description part of the specification itself does not delimit the right to exclude. That is the function and purpose of claims.")). In short, the claims set forth what the inventor regarded as the invention. *See* 35 U.S.C. § 112(b). Not all claim terms require construction and where a lay person does not need assistance interpreting a claim term, the term is simply given its plain and ordinary meaning. *See Brown v. 3M*, 265 F.3d 1349, 1352 (Fed Cir. 2001) (holding that the claims did "not require elaborate interpretation").

In claim construction, "the words of a claim 'are generally given their ordinary and customary meaning.'" *Phillips*, 415 F.3d at 1312 (citing *Vitronics*, 90 F.3d at 1582) (additional citations omitted). What is ordinary and customary is measured at the time of the invention and is based off the understanding of a "person of ordinary skill in the art in question." *Id.* at 1313 (citing *Innova*, 381 F.3d at 1116) (additional citations omitted).

In constructing claims, the Court relies on intrinsic evidence and extrinsic evidence. Intrinsic evidence is preferred and includes the context of the entire patent and its prosecution history. *Id.* at 1313–14. Extrinsic evidence, like expert testimony, dictionaries, and treatises, is generally of less significance than the intrinsic record. *Id.* at 1317 (citing *C.R. Bard, Inc. v. U.S. Surgical Corp.*, 388 F.3d 858, 862 (Fed. Cir. 2004)). In approximate descending order of significance, the Court should consider "the words of the claims themselves, the remainder of the specification, the prosecution history, and extrinsic evidence concerning relevant scientific principles, the meaning of technical terms, and the state of the art." *Id.* at 1314 (quoting *Innova*, 381 F.3d at 1116). Often the claims themselves and the remainder of the specification is dispositive as it "is the single best guide to the meaning of a disputed term." *Vitronics*, 90 F.3d at 1582. "Relying on extrinsic evidence to construe a claim is proper only when the claim language remains genuinely ambiguous after consideration of the intrinsic evidence." *Interactive Gift Exp. Inc. v. Compuserve, Inc.*, 256 F.3d 1323, 1332 (Fed. Cir. 2001).

ORDER – 4

**B. Construction of Terms**

**Term 1.**   "linked user identification module" – (Claims 1, 5, 7, 10, 11, 14, 17, 18)

| Uniloc's Construction | HTC's Construction |
|---|---|
| Plain and ordinary meaning.<br><br>Alternatively, "an authorized user identification module that permits the normal operation of the device" | "a user identification module that is the only one that permits normal operation of the device" |

| Court's Construction | "a user identification module that is the only one that permits normal operation of the device" |
|---|---|

This is the most hotly contested of the terms. The parties provide reasonable and compelling arguments in support of their positions and each enjoys the benefit of a prior court order adopting its favored interpretation. While both constructions have support, the Court adopts HTC's proposed construction and that of the *Google*/*Samsung* court.

The parties' dispute is whether the '654 Patent contemplates that multiple user identification modules can be linked to a device at any one time or whether it contemplates that a device is limited to use with a single user identification module after being linked. Uniloc relies on the fact that the first mentions of the "linked user identification module," in both the patent as a whole and in Claim 1, are proceeded by an "a" term. '654 Patent at Abstract, ln. 2; 1:7. As such, Uniloc invokes the Federal Circuit's rule of construction—not merely a presumption or a convention—

> [t]hat "a" or "an" can mean "one or more." . . . The exceptions to this rule are extremely limited: a patentee must "evince[] a clear intent" to limit "a" or "an" to "one." The subsequent use of definite articles "the" or "said" in a claim to refer back to the same claim term does not change the general plural rule, but simply reinvokes that non-singular meaning. An exception to the general rule that "a" or "an" means more than one only arises where the language of the claims themselves, the specification, or the prosecution history necessitate a departure from the rule.

ORDER – 5

*Baldwin Graphic Sys., Inc. v. Siebert, Inc.*, 512 F.3d 1338, 1342–43 (Fed. Cir. 2008) (citations and additional authority omitted). Uniloc further draws support from the *Motorola* court's recognition that "[t]here is nothing in the patent that requires that only one linked user identification module will permit the normal operation of the device for all embodiments. Thus, the patent is not limited to only one linked user identification module for all embodiments." Dkt. #42 at 25 (*Motorola Order* at 3).

But HTC—and the *Google/Samsung* courts—sufficiently supports a departure from the Federal Circuit's rule of construction by presenting evidence that the '654 Patent's use of "a" is limited to "one." First, the '654 Patent invokes the '175 Patent as Prior Art of the Invention and indicates that the '175 invention "comprises establishing a link between the device and *a specific user identification module* and blocking the normal operation of the device when the user identification module that is placed inside the device is not the *one* that is linked to the device." '654 Patent at 1:20–30 (emphasis added). The '175 Patent further claims

> a so-called locked mode in which the terminal can be used only with a user card *with which it is "locked"*, called the linked user card. In other words, a link is established between the terminal and a particular user card (the linked user card).

Dkt. #46-6 at 8 ('175 Patent at 2:14–21) (emphasis added). The '175 Patent claimed and was limited to a "locked mode" in which the phone and the user identification module were directly linked only to each other and the '175 Patent, so limited, was directly adopted by the '654 Patent.

In addition, and as noted by the *Google/Samsung* courts, this interpretation is further supported by the specifications of the '654 Patent:

> Figure 3 and the description thereof reinforce this understanding. Referring to Figure 3, in box K1 the user has access to a "configuration menu" whereby the user "has the choice of either or not locking his device." '654 Patent at 2:63–66. "When the user locks his device," the module that is in the device is "automatically linked to the device." *Id.* at 2:67–3:2.

ORDER – 6

Dkt. #42 at 46 (*Google Order* at 12). Thus, the '654 Patent specifically claims an initial step where the device is locked and thereby linked to *the* user identification module installed. This linking occurs when a single user identification module is inside the device and the device is thereafter linked to *that single* user identification module. Accordingly, the Court adopts HTC's proposed construction of "linked user identification module" as "a user identification module that is the only one that permits normal operation of the device."

**C. Means Plus Function Terms**

The parties initially agreed that five of the first ten disputed terms needed construction are means-plus-function claims. Means-plus-function claims are governed by 35 U.S.C. § 112(f) (previously § 112 ¶ 6) which provides that claims may be expressed "as a means or step for performing a specified function." 35 U.S.C. § 112(f). In means-plus-function claims, the inventor may claim the invention in terms of the function performed, as long as the specification discloses the structure that performs the associated function. *See Med. Instrumentation & Diagnostics Corp. v. Elekta AB*, 344 F.3d 1205, 1211 (Fed. Cir. 2003).

Construction of means-plus-function claims starts with determining the claimed function. *Applied Med. Res. Corp. v. U.S. Surgical Corp.*, 448 F.3d 1324, 1332 (Fed. Cir. 2006) (citation omitted). Then a court "must identify the corresponding structure in the written description of the patent that performs that function." *Id.* The ultimate guide is whether the claim would be "understood by persons of ordinary skill in the art to have a sufficiently definite meaning as the name for structure." *Id.* at 1348 (citing *Greenberg v. Ethicon Endo–Surgery, Inc.,* 91 F.3d 1580, 1583 (Fed.Cir.1996) ("What is important is . . . that the term, as the name for structure, has a reasonably well understood meaning in the art.")). For computer implemented means-plus-function claims, the disclosure must be "'more than simply a general purpose computer or microprocessor,' . . . the specification [must] 'disclose an algorithm for performing the claimed

ORDER – 7

function.'" *Noah Sys., Inc. v. Intuit Inc.*, 675 F.3d 1302, 1312 (Fed. Cir. 2012) (citations omitted). The algorithm may be expressed "in any understandable terms, including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Id.* (quoting *Finisar Corp. v. DirectTV Grp., Inc.*, 523 F.3d 1323, 1340 (Fed. Cir. 2008) (internal citations omitted in original)).

As noted, the parties disputed the construction of Terms 2, 3, 4, 5, and 10 and agreed that the Court's construction was necessary. Dkt. #46 at 14–20. As to Terms 2, 3, and 5, the parties agreed on the stated function of the terms. For those terms, then, the dispute was whether the specifications disclosed sufficient structures, clearly linked to the agreed functions. As to Terms 4 and 10, the parties asserted different functions and also disputed whether the specifications disclosed sufficient structures, clearly linked to those functions.

However, on the morning of the *Markman* hearing, HTC informed the Court that the parties' positions had changed. Uniloc no longer asserted infringement on the basis of Claim 4, eliminating the need for construction of Term 10. HTC no longer asserted that Term 2 was indefinite and requested only slight modifications to the structure proposed by Uniloc. HTC no longer asserted that Term 4 was indefinite and proposed a new corresponding structure for its proposed function. Further, HTC no longer contested Uniloc's proposed construction of Term 5. These changes are reflected below.

**Term 2.**   "blocking means for preventing a normal operation of the mobile radiotelephony device" – (Claim 1)

| Uniloc's Construction | HTC's Construction |
|---|---|
| Function: "preventing a normal operation of the mobile radiotelephony device" | Function: "preventing a normal operation of the mobile radiotelephony device" |
| Structure: "the hardware programmed to (i) disconnect from the network if an identification module that is not linked to the device is placed inside the device (col. | Structure: "the microprocessor assembly programmed to (i) disconnect from the network if an identification module that is not linked to the device is placed inside the |

ORDER – 8

| | |
|---|---|
| 3:14–20); (ii) prevent all outgoing calls, except possibly emergency calls, if the device has remained in a state of availability longer than a predetermined threshold of time (col. 3:33–46); and (iii) prevent all calls if an incorrect deblocking code is entered above a threshold amount (col. 3:52–60)" | device (col. 3:14–20); (ii) prevent all outgoing calls, except possibly emergency calls, if the device has remained in a state of availability longer than a predetermined threshold of time (col. 3:33–46); and (iii) prevent all calls if an incorrect deblocking code is entered above a threshold amount (col. 3:52–60)" |//
| **Court's Construction** ||
| <u>Function</u>: "preventing a normal operation of the mobile radiotelephony device"<br><br><u>Structure</u>: "the microprocessor assembly programmed to (i) disconnect from the network if an identification module that is not linked to the device is placed inside the device (3:14–20); (ii) prevent all outgoing calls, except possibly emergency calls, if the device has remained in a state of availability longer than a predetermined threshold of time (3:33–46); and (iii) prevent all calls if an incorrect deblocking code is entered above a threshold amount (3:52–60)" ||

As noted above, HTC conceded its argument that this term failed because it was indefinite as to structure. The dispute between the parties then consisted of whether the structure should be generally referred to as "hardware" or a "microprocessor assembly." While the dispute would appear to have little practical importance, the Court agrees with the *Google/Samsung* court and adopts the use of "microprocessor assembly."

Accordingly, the Court adopts HTC's proposed construction of "blocking means for preventing a normal operation of the mobile radiotelephony device" as a means-plus-function claim setting forth a function of "preventing a normal operation of the mobile radiotelephony device" and a structure consisting of "the microprocessor assembly programmed to (i) disconnect from the network if an identification module that is not linked to the device is placed inside the device (3:14–20); (ii) prevent all outgoing calls, except possibly emergency calls, if the device has remained in a state of availability longer than a predetermined threshold of time (3:33–46); and (iii) prevent all calls if an incorrect deblocking code is entered above a threshold amount (3:52–60)."

ORDER – 9

**Term 3.** "timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" – (Claim 1)

| Uniloc's Construction | HTC's Construction |
|---|---|
| Function: "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a predefined period of time subsequent to the mounting of a linked user identification module inside the mobile radiotelephony device"<br><br>Structure: "the hardware programmed to determine whether the device has remained in the state of availability for a designated period of time, and if so, to block the device and require a deblocking code to restore normal functioning (col. 3:31-43)" | Function: "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device"<br><br>Structure: No corresponding structure for performing the recited function is disclosed in the specification of the '654 Patent. This term is therefore indefinite. |

| Court's Construction |
|---|
| Function: "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a predefined period of time subsequent to the mounting of a linked user identification module inside the mobile radiotelephony device"<br><br>Structure: "the microprocessor assembly programmed to determine whether the device has remained in the state of availability for a designated period of time, and if so, to block the device and require a deblocking code to restore normal functioning (3:31–43)" |

Again, the parties agree as to the function set forth in this means-plus-function claim. The parties further agree on the relevant portion of the specifications:

> If the identification module that is placed inside the device is linked to the device (arrow Y4), one looks whether the device has remained in the state of availability for a certain period of time T of the order of several minutes, for example (box K10). If this is not the case (arrow N10), the device remains in the state of availability indicated in box K1. If this is the case (arrow Y10), the device passes on to a second blocking state indicated in box K11 by passing through an initialization step K12 which permits to initialize a variable A which represents the number of attempts made at supplying a deblocking code (for example, the Personal Identification Number) PIN.

ORDER – 10

1   '654 Patent at 3:32–43. However, HTC maintains that this fails to disclose sufficient structure, clearly linked to the function, and that the term is therefore indefinite. *See Noah Sys.*, 675 F.3d at 1311 ("corresponding structure" must be clearly linked to, or associated with, the function) (citation omitted).

HTC argues that the any structure provided in the specifications cannot be clearly linked to the agreed function because there is a clear disconnect between the two. *See* Dkt. #47 at 11. Specifically, HTC points out that the function relies on the device being "inactive" while the specification only references the device remaining in a "state of availability for a certain period of time." HTC argues that no structure is identified for monitoring inactivity and that the term is therefore indefinite. *Id.*

The argument has some appeal as cited specification leaves some uncertainty as to the algorithm's specific operation and could be considered a "black box" that merely performs a recited function. *See Augme Techs., Inc. v. Yahoo! Inc.*, 755 F.3d 1326, 1338 (Fed. Cir. 2014) ("Simply disclosing a black box that performs the recited function is not a sufficient explanation of the algorithm required to render the means-plus-function term definite.") (citations omitted). The structure is simplistic: "one looks whether the device has remained in the state of availability for a certain period of time T of the order of several minutes."[7] '654 Patent at 3:33–36. Uniloc maintains that the structure is a simple timer. *See* Dkt. #46 at 10 ("the structure is the hardware (or device itself) programmed to determine if a set amount of time has expired"). The specification, or the associated figures, certainly could provide additional detail for the structure—disclosing whether a specific event triggers the timer or whether the structure

---

[7] '654 Patent at 3:33–36.

ORDER – 11

periodically "checks" to determine whether the device is inactive. But this lack of specificity does not make the term indefinite.

Structure may be expressed "in any understandable terms, including as a mathematical formula, in prose, or as a flow chart, or in any other manner that provides sufficient structure." *Noah Sys.*, 675 F.3d at 1312 (quoting *Finisar Corp.*, 523 F.3d at 1340). Further, the "[i]dentification of corresponding structure may embrace more than the preferred embodiment." *Micro Chemical, Inc. v. Great Plains Chemical Co., Inc.*, 194 F.3d 1250, 1258 (Fed. Cir. 1999). What is important is that the claims set forth sufficient structure to "render the bounds of the claim understandable to one of ordinary skill in the art." *AllVoice Comp. PLC, v. Nuance Commc'ns, Inc.*, 504 F.3d 1236, 1245 (Fed. Cir. 2007)). Such is the case here as the Court concludes that one skilled in the art would have little trouble in understanding the structure set forth—a timer monitoring activity/inactivity—though several equivalents may be possible to accomplish that function.

Accordingly, the Court constructs "timing means for activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a defined period of time subsequent to a mounting of a linked user identification module inside the mobile radiotelephony device" as a means-plus-function claim setting forth a function of "activating the blocking means in response to the mobile radiotelephony device being inactive during the normal operation of the mobile radiotelephony device for a predefined period of time subsequent to the mounting of a linked user identification module inside the mobile radiotelephony device" and a structure consisting of "the microprocessor assembly programmed to determine whether the device has remained in the state of availability for a designated period of time, and if so, to block the device and require a deblocking code to restore normal functioning (3:31-43)."

ORDER – 12

**Term 4.** "deblocking means for permitting the normal operation of the mobile radiotelephony device" – (Claim 1)

| Uniloc's Construction | HTC's Construction |
|---|---|
| Function: "permitting the normal operation of the mobile radiotelephony device"<br><br>Structure: "the hardware programmed to invite the user to supply a deblocking code and allow the device to return to the first or second blocking states (col. 3:17-27, 3:48–52)" | Function: "permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device subsequent to the mounting of the linked user identification module inside the mobile radiotelephony device and subsequent to the defined period of time"<br><br>Structure: "a microprocessor assembly programmed to execute the algorithms set forth in the '654 patent at col. 3:44–58, and equivalents thereof" |

| Court's Construction |
|---|
| Function: "permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device"<br><br>Structure: "the microprocessor assembly programmed to allow the user to supply a deblocking code and, upon entry of the correct deblocking code, to return the device to normal operation (3:48–61)" |

HTC has conceded that the structure is not indefinite. As a result, the Court constructs the term consistently with the parties' proposals and in the language most understandable for the trier of fact. Accordingly, the Court constructs "deblocking means for permitting the normal operation of the mobile radiotelephony device" as a means-plus-function claim setting forth a function of "permitting the normal operation of the mobile radiotelephony device in response to a supply of a deblocking code to the mobile radiotelephony device" and a structure consisting of "the microprocessor assembly programmed to allow the user to supply a deblocking code and, upon entry of the correct deblocking code, to return the device to normal operation (3:48–61)."

//

//

//

ORDER – 13

**Term 5.** "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module" – (Claim 5)

| Uniloc's Construction | HTC's Construction |
|---|---|
| Function: "establishing a link between the mobile radiotelephony device and the linked user identification module"<br><br>Structure: "the hardware involved in the reading of data from the identification module, and storage of such data in the memory of the radiotelephony device" | Agrees to Uniloc's proposed construction. |

| Court's Construction |
|---|
| Function: "establishing a link between the mobile radiotelephony device and the linked user identification module"<br><br>Structure: "the microprocessor assembly involved in reading of data from the identification module, and storage of such data in the memory of the radiotelephony device" |

HTC has agreed to Uniloc's proposed construction of Term 5.  Likewise, the Court finds Uniloc's proposed construction appropriate with the exception that the Court alters "the hardware involved" to the "microprocessor assembly involved" so as to maintain consistency with the construction of the other terms before the Court.  Accordingly, the Court constructs "connecting means for establishing a link between the mobile radiotelephony device and the linked user identification module" as a means-plus-function claim setting forth a function of "establishing a link between the mobile radiotelephony device and the linked user identification module" and a structure consisting of "the microprocessor assembly involved in reading of data from the identification module, and storage of such data in the memory of the radiotelephony device."

**Term 10.** "locking means for facilitating an activation of the block means by the timing means" – (Claim 4)

| Uniloc's Construction | HTC's Construction |
|---|---|
| Plain and ordinary meaning. | Function: "facilitating an activation of the block means by the timing means"<br><br>Structure: No corresponding structure for performing the recited function is disclosed |

ORDER – 14

|  | in the specification of the '654 Patent. This term is therefore indefinite. |
|---|---|

The parties agree that construction of Term 10 is no longer necessary. *See* Dkt. #46 at 19 (Uniloc noting that if prior "constructions [of Term 10] remain, there is no claim to assert" and that "[i]f those constructions are overturned by the Federal Circuit, the appellate court's construction will apply"). The Court agrees that no construction of Term 10 is necessary.

### D. Computer Readable Code Terms

HTC originally maintained that the so called "computer readable code" terms (Terms 6–9) "should be interpreted as a computer-implemented means-plus-function term" and that each term is "indefinite because the specification fails to disclose and clearly link an algorithm to perform the recited function." Dkt. #47 at 16 (citing *Noah Sys.*, 675 F.3d at 1319). However, as previously noted, HTC has conceded its position. The Court accordingly adopts Uniloc's position and agrees that Terms 6–9 should be given their plain and ordinary meaning.[8]

//

//

---

[8] The Court does note that the conclusion is also supported by applicable case law. Claims using "means" are presumed to be means-plus-function claims and those not using "means" are presumed not to be means-plus-function claims. *Williamson v. Citrix Online*, LLC, 792 F.3d 1339, 1347–48 (Fed. Cir. 2015). Because the "computer readable code terms" do not use the word "means," there is "a rebuttable presumption that § 112, ¶ 6, does not apply." *Zeroclick, LLC v. Apple Inc.*, 891 F.3d 1003, 1007 (Fed. Cir. 2018). Further, Uniloc identifies the claims as *Beauregard* claims that disclose "a claim to a computer readable medium . . . containing program instructions for a computer to perform a particular process." *CyberSource Corp. v. Retail Decisions, Inc.*, 654 F.3d 1366, 1373 (Fed. Cir. 2011). Lastly, and as Uniloc notes, numerous courts have concluded that terms such as "'computer-readable medium,' 'computer readable storage medium,' 'executable . . . code,' 'executable software' and 'computer software'" connote sufficient structure. Dkt. #46 at 21 n.4 (gathering cases); Dkt. #49 at 12; *see also Apple Inc. v. Motorola, Inc.*, 757 F.3d 1286, 1298–99 (Fed. Cir. 2014) ("Requiring traditional physical structure in software limitations lacking the term means would result in all of these limitations being construed as means-plus-function limitations and subsequently being found indefinite.").

ORDER – 15

**E. HTC's Additional Requested Terms and Supplemental Briefing**

HTC, in the parties' prehearing statement, requested that the Court construct at least thirteen and preferably seventeen terms, in excess of the local rule's allowance of ten terms. Dkt. #42 at 3. HTC did not provide a clear justification for its request beyond asserting that "additional terms are important for purposes of non-infringement and invalidity." *Id.* HTC never filed a motion seeking relief from the Court's local patent rules and did not address the need for construction of additional terms in any of its briefing. Then, on the morning of the *Markman* hearing, HTC informed the Court that five[9] of the first ten terms were no longer in dispute and again requested that the Court consider its additional terms.

The Court does not take well to the tactical gamesmanship. HTC was aware of the Court's local patent rule limiting claim construction to the ten most important terms absent leave of the Court. HTC represented to the Court what it viewed as the ten most important terms and then, on the morning of the hearing and with no explanation, changed the terms it asked the Court to consider. Despite an asserted need, HTC has never explained why construction of additional terms is necessary. The Court elects not to construct the additional terms (Terms 11–17) requested by HTC.[10]

Lastly, the Court notes the supplemental briefing filed in this matter. Dkts. #65–67. HTC sought and was granted leave to file supplemental briefing related to positions Uniloc took in separate proceedings, to which HTC is not a party, before the Patent Trial and Appeal Board

---

[9] Four of the terms that HTC no longer disputes are the "computer readable code" terms. The Court notes that HTC's arguments in support of its position on these claims did not appear strong. Nevertheless, HTC prioritized construction of these terms over the construction of the terms it now maintains are more important to its claims and defenses.

[10] The Court notes further, that several of these terms have been addressed in Uniloc's concurrent litigation related to the '654 Patent.

ORDER – 16

("PTAB"). HTC maintained that Uniloc's position before the PTAB undercut its position here. HTC maintained that the position related primarily to the Court's consideration of Terms 1, 5, 6, 11, and 12. Dkt. #65 at 2 n.1. Because Terms 5 and 6 are no longer in dispute, because the Court elected not to construct Terms 11 and 12, and because the Court adopted HTC's proposed construction for Term 1, the Court does not find it necessary to address the supplemental briefing in any depth.

## IV.   CONCLUSION

Accordingly, having considered the parties' Joint Claim Construction and Prehearing Statement, the briefing of the parties, and the remainder of the record, the Court finds and ORDERS that the disputed claim terms are constructed as set forth in this Order.

Dated this 26th day of October, 2020.

RICARDO S. MARTINEZ
CHIEF UNITED STATES DISTRICT JUDGE